OPINION
{¶ 1} Appellants John and Diana Beresh appeal the decision of the Stark County Court of Common Pleas, Juvenile Division, which granted permanent custody of two of their children to Appellee Stark County Department of Job and Family Services ("SCDJFS"). This appeal is expedited, and is being considered pursuant to App.R. 11.2(C). The relevant facts leading to this appeal are as follows.
 {¶ 2} Appellants are the parents of seven children. The youngest two of these children, Ruth and Ken, are the subject of the present appeal. Ruth was born in 1988; Ken was born in 1991. On August 8, 2000, SCDJFS filed a permanent custody complaint alleging that the five unemancipated children were dependent, neglected, and/or abused. The complaint alleged that the Beresh home was described as a "living nightmare," with missing and/or clogged toilets, food scraps on the floors, broken furniture, urine-stained mattresses, rotting food in the kitchen, and flies permeating the house. The children reported having to care for themselves and living in fear of their father. On October 16, 2000, all five children were found dependent by the trial court. SCDJFS was thereupon awarded with a planned permanent living arrangement ("PPLA") as to the five children. SCDJFS withdrew its request for permanent custody at that time.
 {¶ 3} Over the course of the following two years, the oldest three Beresh boys were at various stages removed from SCDJFS custody as they reached or neared the age of emancipation. On October 8, 2002, SCDJFS filed a motion for permanent custody of Ruth and Ken. SCDJFS therein alleged, inter alia, a history of agency involvement with the family on at least eighteen occasions since 1987. The complaint further alleged reports by Ruth and Ken of sexual abuse by their older brothers and physical abuse by their parents (appellants herein). The trial court conducted evidentiary hearings on the permanent custody motion on October 29, 2002 and December 13, 2002.
 {¶ 4} On January 29, 2003, the trial court issued findings of fact and conclusions of law, and rendered a judgment entry granting permanent custody of Ruth and Ken to SCDJFS. Appellants timely appealed, and herein raise the following two Assignments of Error:
 {¶ 5} "I. THE JUDGMENT THAT THE BEST INTERESTS OF THE MINOR CHILDREN WOULD BE SERVED BY PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.
 {¶ 6} "II. APPELLANTS WERE PREJUDICIALLY DEPRIVED OF THEIR UNITED STATES AND OHIO CONSTITUTIONAL RIGHTS TO A FAIR TRIAL DUE TO DUE PROCESS VIOLATIONS PERMITTED BY THE TRIAL COURT."
 I. {¶ 7} In their First Assignment of Error, appellants argue the trial court's conclusion that permanent custody is in the best interests of Ruth and Ken is unsupported by the evidence. We disagree.
 {¶ 8} R.C. 2151.414(B)(1) addresses under what circumstances a trial court may grant permanent custody. This statute provides as follows:
 {¶ 9} "(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 {¶ 10} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 11} "(b) The child is abandoned.
 {¶ 12} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 {¶ 13} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999."
 {¶ 14} In determining the best interest of a child, the trial court is required to consider the factors contained in R.C. 2151.414(D). These factors are as follows:
 {¶ 15} "(1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster care givers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 16} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 17} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 18} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 19} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 20} The testimony of Monica Kress, the ongoing caseworker, reveals that the numerous agency investigations of the Beresh family since 1987 have centered on concerns of living conditions in the home, domestic violence between the parents, physical abuse of the children, and general neglect of the children. Tr. at 8. During counseling arranged for Ruth and Ken as a result of the most recent agency intervention, further concerns arose over Ruth's indication of sexual abuse perpetrated against her by her older brothers Michael, John, and David. Tr. at 12. Ultimately, criminal charges were filed against Michael. Id. Michael thereafter completed the Act One treatment program, and was allowed to return home in order to attend a local university. Tr. at 14. David was also returned to the Beresh home in August 2002 following a period of time spent in a group home. Id. John, who turned nineteen during the period in question, also went back to the Beresh home. Id.
 {¶ 21} Kress assessed the risk of returning Ruth and Ken to their parents as follows: "Well, I think first and foremost that they would be in the home with an admitted offender. I also feel they are telling the truth about things that happened to them in regards to their brother David. I think that would put them at substantial risk of being further abused. I also feel that there's possible retaliation for them speaking up and telling the truth." Tr. at 35-36. Kress also expressed concerns that Ruth's mental limitations could make her a repeat abuse victim in the Beresh home, and that Ken faced the risk of injury due to his age and smaller size. Tr. at 38.
 {¶ 22} SCDJFS also called as a witness Dr. Robin Tener, a child psychologist. Tener first conducted an assessment of the Beresh children in 1997. In October 2001 (one year prior to the evidentiary hearing), Tener prepared a subsequent evaluation report focusing on Ruth's and Ken's psychological assessments and the allegations of sexual abuse. Tr. at 89. Ken reported to her that his home environment had long been, in Tener's words, "completely chaotic and filthy." Tr. at 91. Ken further reported extensive fighting between the brothers and father, including threats of weapon use. Id. Ken further told Tener of David's repeated attempts to sexually abuse him and Ruth. It caused Ken great concern, as he had to endure what he believed to be his sister's victimization over the course of a number of nights. Tr. at 92. According to Ken's recollection, a pattern had emerged of agency intervention in the Beresh home, followed by a "calming down" period, followed by a complete return to the original conditions once the intervention and related therapy had ended. Id. Ruth was also interviewed by Tener, and recalled a similar home environment, adding that she feared disclosing Michael's and David's sexual victimizing for fear of physical retribution. Ruth recalled for Tener that appellant-father once "reprimanded" David for attempting to molest Ruth while she was sleeping, revealing at least one instance of parental knowledge of the sibling sexual abuse. Tr. at 93.
 {¶ 23} Tener's evaluation included interviewing appellants. Tener testified that father acknowledged the chaotic nature and hygienic problems of the home, and that his children frequently physically fought and were essentially out of control. Tr. at 94. He felt he had no other alternative to deal with the turmoil but to scream at the children or otherwise express his anger, including using his fists. Tr. at 94-95.
 {¶ 24} As a result of her evaluation, Tener diagnosed Ken with an adjustment disorder with mixed emotional features, as well as post-traumatic stress disorder. Tr. at 96. Tener found Ruth to be developmentally handicapped, and that she lacked a sense of how to protect herself. Tr. at 96A. Tener opined that both children were "almost shell shocked" as they recounted their family history. Tr. at 97. Both children showed complete distrust that their family would change. Tr. at 98.
 {¶ 25} SCDJFS next called Dr. Carolyn Turner, a clinical psychologist. Dr. Turner took over as Ruth and Ken's individual therapist in December 2001. Tr. at 149. She first tested their cognitive levels, concluding that Ken had average cognitive functioning, while Ruth's IQ testing placed her in the border region between mild and moderate retardation. Tr. at 150-151. Dr. Turner tested also Ken via the Child Personality Questionnaire, finding him highly conscientious, above average in emotional stability, and tending to maintain reasonably good coping skills. Ruth was tested using the MILAN Inventory, resulting in an indication of a compliant and submissive personality tending to seek approval from others, as well as a tendency to anxiousness in response to environmental contingencies. Tr. at 151-152. Both children reiterated their recollections of domestic violence within the home, sexual abuse by older siblings, and prolonged neglect. Tr. at 153. Dr. Turner diagnosed both children with adjustment disorders. Tr. at 154.
 {¶ 26} When asked about any decreased functioning observed in Ruth and Ken, Dr. Turner noted the impact of family therapy encounters: "I think that the children responded to the presence of their parents with the sort of anxious response that we talk about discussed (sic) post traumatic stress." Tr. at 157. When informed that family therapy would be starting, Ruth sat silently for fifteen minutes, then spoke in a tearful and apprehensive fashion. Tr. at 158. Similarly, according to Dr. Turner, "Ken very strongly has stated that he does not wish to return to the care of his biological parents and tends to feel at times let down by the system, he feels that by this time, he and his sister should have been allowed to be adopted and he's very frustrated, it felt like going backwards in his mind." Tr. at 159. Dr. Turner noted that the resumption of therapeutic visits with appellants coincided with incidents of enuresis suffered by Ken. Tr. at 155, 164. Ken also reported being threatened by appellant-father during one of the visits. Tr. at 167-168. Dr. Turner concluded that the visits with appellants ultimately impaired the emotional, social, and academic functioning of Ruth and Ken. Tr. at 168. She further expressed the opinion that Ken and Ruth would be at risk of revictimization if contact were allowed with the older brothers. Tr. at 170. Dr. Turner further saw no hope of successful reunification even after the passage of more time. Tr. at 171.
 {¶ 27} Appellants both testified in response to SCDJFS's case. Appellant-mother, who is employed full-time in factory work for a Rubbermaid subsidiary, testified that Ken and Ruth indicated to her a desire to return home at the second of the five family visits. Tr. at 229. She stated she missed the children and would protect them if they were returned to her custody. Id. On cross-examination, she denied ever having experienced domestic violence or a physical altercation between any of her children, and stated neither she nor her husband had ever beaten the children. Tr. at 231. However, SCDJFS counsel then had appellant-mother identify her handwriting from a 1990 police report in which she made reference to incidents of spousal and child abuse, as well as physical threats and drinking by appellant-father in the Beresh home. Tr. at 234. Appellant-father also testified that he had never physically disciplined Ruth and Ken, although he recalled using spanking on the older children prior to certain SCDJFS services being introduced in the early nineties. Tr. at 271. He admitted to having "mixed it up" with his son John in the past when John had assaulted him with a knife. Tr. at 273. He stated the house had been chaotic during the late nineties, but was no longer in such a state. Id. On cross-examination, he disavowed any knowledge of sexual abuse in his home prior the removal of Ken and Ruth. Tr. at 281.
 {¶ 28} Appellants first contend that the admitted five-month delay by SCDJFS in commencing therapeutic family visits obstructed a proper review of the interaction between Ruth and Ken and appellants per R.C.2151.414(D)(1). Appellants further allege that Dr. Tener and Dr. Turner conveyed a message to Ruth and Ken that they were never going to be returned to appellants. Appellants charge that for over two years Ruth and Ken were placed in the equivalent of a "witness protection" program where they heard nothing positive about their parents. Appellants' Brief at 10. Appellants further contend that prior removal of their children in past years resulted in working under case plans such that the children were eventually returned. Finally, appellants note, in regard to the provision of secure placement under R.C. 2151.414(D)(4), that appellant-father is a decorated U.S. Army pilot and Vietnam veteran, and has worked as an air traffic controller for over twenty-five years.
 {¶ 29} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (February 10, 1982), Stark App. No. CA-5758. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. (1978), 54 Ohio St.2d 279. Moreover, in proceedings involving the custody and welfare of children, the power of the trial court to exercise discretion is peculiarly important. In re Rossantelli Children, Delaware App. No. 01CAF12072,2002-Ohio-2525, citing Thompson v. Thompson (1987), 31 Ohio App.3d 254,258, and Trickey v. Trickey (1952), 158 Ohio St. 9, 13. Upon review of appellants' aforementioned contentions in light of the entire record, including the exhibits and the guardian ad litem's report, we conclude the trial court's grant of permanent custody to SCDJFS was not against the manifest weight of the evidence.
 {¶ 30} Appellants' First Assignment of Error is overruled.
 II. {¶ 31} In their Second Assignment of Error, appellants contend they were deprived of a fair hearing on the permanent custody motion. We disagree.
 {¶ 32} Appellants center their argument on the trial judge's apparent decision not to follow through on his statement made following the first day of evidence (October 29, 2002) that he would interview Ken and Ruth. In In re Funk, Portage App. Nos. 2002-P-0035, 2002-P-0036,2002-Ohio-4958, the court noted " *** R.C. 2151.414(D)(2) clearly provides that a child's wishes may be `expressed directly by the child or through the child's guardian ad litem * * * [.]' That is to say, a juvenile court has the option of either having the child assert his or her opinion, through, for example, an in-camera interview or testimony, or the court may rely upon the guardian ad litem's representations with respect to the child's desires. Because the juvenile court has a choice, the decision not to conduct an in camera interview will be reversed only if the court abused its discretion in declining to do so. (Citation omitted)."
 {¶ 33} Based on the extensive testimony of Dr. Tener and Dr. Turner, and in light of the entire record and GAL report, we are unpersuaded that the lack of an in camera interview of the two children constituted an abuse of discretion or reversible due process error in this case.
 {¶ 34} Appellants' Second Assignment of Error is therefore overruled.
 {¶ 35} For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas, Juvenile Division, Stark County, Ohio, is hereby affirmed.
By: Wise, J., Gwin, P.J., and Farmer, J., concur.